## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WOOD ENVIRONMENT &
INFRASTRUCTURE SOLUTIONS,
INC.,

        Plaintiff,

v.

W.R. GRACE & CO. – CONN.,

        Defendant.

Civil Action File
No.: _____

## COMPLAINT

Plaintiff Wood Environment & Infrastructure Solutions, Inc. ("Wood"), through its undersigned attorneys, states this Complaint against W.R. Grace & Co. – Conn. ("Grace") and in support thereof, avers the following:

## INTRODUCTION

1.  Over the past seventy-five years, Grace has owned a facility that contained hazardous nuclear materials left over from Grace's processing of thorium. For decades, Grace allowed the materials to remain unabated as it negotiated with various government agencies, including the Department of Energy, the Environmental Protection Agency, and the United States Army Corps of Engineers regarding responsibility for the cleanup. Grace, or one of its affiliates,

even went so far as to declare bankruptcy, presumably in an effort to avoid the full cost of the remediation.  Ultimately, a settlement was reached that included a plan to remediate, once and for all, the contaminated site.  Grace hired Wood, a world leader in environmental cleanup, to perform some of the early phase work associated with the remediation.  It immediately became apparent that the plan that Grace had developed, presumably over the past decades, was fundamentally flawed and required additional design.  Wood identified the additional costs and schedule impacts to overcome Grace's flawed design.  In response, Grace placed the work on hold, delaying the remediation even further.  Grace spent the next year bickering with Wood about the cost to overcome Grace's plan to remediate Grace's facility.  When Wood refused to lower its price, Grace terminated the contract for convenience.   Wood followed Grace's direction and requested payment consistent with the Contract, but Grace has refused to release payment.

## **PARTIES**

2.     Wood is a corporation organized under the laws of the State of Nevada and its principal place of business is 1075 Big Shanty Road NW, Suite 100, Kennesaw, GA 30144.   Wood is a global leader in environmental and

infrastructure solutions and provides engineering and construction services throughout the world.

3.     Grace is a corporation organized under the laws of Connecticut and its principal place of business is 7500 Grace Drive, Columbia, Maryland 21044.  Grace is an international specialty chemicals company.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Grace is subject to personal jurisdiction in the State of Georgia, elected to enter into a Contract (defined below) with Wood that is based in Georgia, a substantial portion of the work at issue was performed in Georgia in preparation for the remediation and a substantial part of the events or omissions giving rise to the claims occurred in this District.  Moreover, Grace is registered to do business in the State of Georgia and has a registered agent in Georgia.

## GOVERNING LAW

6.      The Contract "shall be governed by and interpreted according to the laws of the State where the Project is located, without regard to its conflicts of laws provisions."

7.      The project that is the subject of this dispute is located in Maryland, and therefore Maryland law governs the Contract.

## FACTS

**The Project and the Contract**

8.      Grace owns an industrialized peninsula in South Baltimore that consists of 260 acres, and the property is bordered on three sites by water.  Grace has owned a chemical processing and manufacturing facility that sits on the property known as the Curtis Bay Works (the "Facility") since the early 1900s.

9.      Grace first started processing chemicals at the Facility in 1909, including various agricultural fertilizers and industrial chemicals.  During World War II, the Facility manufactured explosives.

10.      Following World War II, Grace (through one of its predecessor entities), extracted radioactive thorium from monazite sand that Grace had

imported from other locations. Grace undertook such extraction of thorium between 1955 and 1957.

11.    The thorium processing was conducted in an area of the Facility known as Building 23.  As a result of the thorium extraction process, certain components and equipment of Building 23 became contaminated with radiation.  In addition, Grace allowed the soils beneath Building 23 to also become contaminated with radioactive material.  All waste material generated at the plant was disposed in an area adjacent to the Facility.

12.    In 1984, the Department of Energy selected the Facility for inclusion in the Formerly Utilized Sites Remedial Action Program, a nationwide program targeted at cleaning up sites contaminated by radiological elements resulting from the United States' early atomic energy program.

13.    The Department of Energy later transferred oversight responsibility of the program to the United States Army Corp of Engineers (USACE).

14.    In 2001, the USACE began a remedial investigation into the Facility and, specifically, Building 23.  The remedial investigation included the development of a proposed remedial action plan.

15.    Around that same time, Grace and its affiliates filed for reorganization under Chapter 11 of the Bankruptcy Code, presumably to avoid the full cost associated with the remediation of certain environmental cleanups throughout the United States of America.

16.    In 2005, the USACE issued a record of decision for Building 23 that set out a plan to address areas impacted by residual radioactivity due to Grace's thorium processing.

17.    On April 21, 2008, the United States Bankruptcy Court for the District of Delaware approved a settlement agreement between, among others, Grace and the United States for certain alleged environmental liabilities at Curtis Bay pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq.  The settlement agreement required Grace to contribute approximately $41 million to efforts to clean up radioactive contamination at the Facility and Building 23.

18.    The initial remedial action included the removal of equipment and building components from Building 23 with the highest reported radiological levels.  These efforts were unsuccessful.

19.     In 2019, some 65 years after the contamination of the Facility and surrounding soil, Grace and the USACE developed a new proposed remedial action plan to complete the site cleanup as required under the settlement agreement.   The new action plan called for the demolition of the southwest quadrant of Building 23.

20.     To assist with the mandated cleanup of its Facility and Building 23, on or about December 30, 2019, Grace engaged Wood through an Environmental & Remediation Services Agreement (the "Contract").   Wood agreed to provide certain utility and pre-demolition work in support of the demolition of the southwest quadrant of Building 23 (the "Project").   Grace agreed to pay Wood a total of $10,347,581 for the work.   A true and correct copy of the Contract is attached as Exhibit A.

21.     With respect to changes in the work, Wood was entitled to additional costs or an adjustment to the schedule if its performance was affected by reasons beyond its control.   Section 8 of the Contract, titled Change Orders, provides in pertinent part:

> Contractor shall be entitled to additional compensation and adjustment to the Schedule for additional costs and delays in Contractor's performance resulting from causes

beyond the reasonable control of Contractor, to include
third party interference.

22.     In the event that Wood's performance was affected but the
parties could not agree on an appropriate adjustment to the contract price or
schedule, Grace was permitted to make changes to the work through a change
directive.  If, after further negotiation, the parties still could not agree, Wood was
entitled to be paid on a time and materials basis for the changed work.  *See* Exhibit
A, § 8.

23.     The Contract also governed the parties' rights and obligations if
work was suspended or if the Contract was terminated.  As it relates to Grace's
right to terminate the Contract for its convenience, Section 15.2 provides in
pertinent part:

> Grace reserves the right to terminate this [Contract] . . . at
> any time for Grace's convenience upon notice in writing
> to Contractor . . . provided that should the Work be so
> cancelled by Grace, Contractor shall be paid for all Work
> performed based upon the fair value of the Work
> completed and accepted by Grace, and any Work
> satisfactorily in progress, in relation to the total
> compensation due hereunder[.]

24.     With respect to Grace's right to suspend the work, Section 15.3
provides in pertinent part:

> Grace reserves the right to suspend the Work . . . .
> Should the Work be so suspended, Contractor shall be
> paid for all Work performed through the effective date of
> the suspension, including any demobilization costs.  If
> and when the suspension is lifted, Grace shall
> compensate the Contractor for remobilization, if
> applicable.

25.    The term of the Contract ran from December 30, 2019 through December 31, 2020, unless earlier terminated or extended by either party.

26.    Under the Contract, Grace was responsible for, among other things, providing the utility and pre-construction design for the Project, which included the structural and electrical design.

**Wood's Additional Efforts on the Project**

27.    Shortly after Grace and Wood executed the Contract and Grace issued the Project design specifications, it became apparent to Wood that Grace's design was flawed and incomplete.  In order for the work to proceed, Wood raised numerous requests for information that needed to be answered by Grace and its design professionals.

28.    On February 19, 2020, Wood submitted a request for information ("RFI") to clarify whether it had to install certain necessary electrical equipment that was not specified on the design drawings released by Grace.  Grace

provided a final response to Wood's RFI 65 days later.  At the same time, Grace issued its first design bulletin ("Bulletin 1").  A design bulletin is a formal document that identifies supplemental instructions or changes to design or construction documents after a contract has been executed.  In that vein, Grace's Bulletin 1 included substantial design changes to Wood's work that could not have been anticipated at the time Wood and Grace executed the Contract.  The design changes in Bulletin 1 delayed Wood's work and caused it to incur additional costs.

29.    For example, Grace's initial design failed to list all electrical loads that were necessary for input into a power systems analysis ("Power Analysis") for the Project.  On March 19, 2020, Wood submitted its Power Analysis to Grace that was based on all available electrical load information provided in the design drawings.  On April 21, 2020, Grace rejected Wood's Power Analysis and identified additional electrical loads that Wood needed to take into account.  These additional electrical loads were not identified in Grace's design drawings.  As a result, Wood spent extra time and costs to manually inspect the Facility to find the additional electrical loads to include in the Power Analysis.

30.    On May 19, 2020, Wood submitted Potential Change Order 04 to Grace.  Consistent with Section 8 of the Contract, Wood sought additional

compensation and an extension to the schedule associated with the design changes in Bulletin 1 and Wood's additional work to identify electrical loads for the Power Analysis.   Grace acknowledged that Bulletin 1 constituted a changed condition consistent with Section 8, but Grace did not provide Wood its requested relief.

31.    Over the next several months, Grace continued to request changes to the Power Analysis.  Grace's continued requests forced Wood to spend more time identifying electrical loads that were not specified in Grace's design drawings.  As a result, Wood's work was continually delayed and Wood incurred even more additional costs.  Similarly, Wood's contractors, including Kimball Construction Co., Inc. and Kelly Electric, were similarly delayed and also incurred additional costs as a result of Grace's incomplete design.

32.    On November 6, 2020, consistent with Section 8 of the Contract, Wood submitted another change order request, Potential Change Order 21 ("PCO 21"), to request additional costs and an extension to the contact schedule associated with the alterations to Grace's design issued under Bulletin 1.  Wood's PCO 21 demonstrated that Grace's late design changes increased both the cost and time for performance of the work through no fault of Wood.

33.    In PCO 21, Wood sought an increase of $4,064,864.68 to the contract price, along with a 274-day extension of time for its additional efforts.

34.    Grace has acknowledged that the design changes included in Bulletin 1 impacted Wood's performance on the Project.  Under the Contract, this requires Grace to: (i) provide Wood with additional compensation and/or schedule extensions via a mutually agreed upon change order; or (ii) issue a unilateral change directive and, if Grace and Wood cannot agree on the cost for the additional work, compensate Wood on a time and materials basis for the work. Grace did neither despite its obligations under the Contract.

**Suspension of Work and Termination of the Contract**

35.    Instead, fewer than two weeks after Wood submitted PCO 21 Grace suspended Wood's work.  On November 18, 2020, Grace suspended Wood's work on the Project effective November 29, 2020.  In response to Grace's suspension notice, Wood and its subcontractors demobilized from the Project site as required by the Contract.

36.    Grace never lifted the suspension.  Instead, five months later, on April 20, 2021, Grace issued Wood a notice of its intent to terminate the Contract.  Grace alleged that Wood breached the Contract despite that it suspended

Wood's work five months prior and Wood had not performed any work since the suspension.  On July 9, 2021, Grace issued Wood a demand to cure what Grace viewed as Wood's breaches of the Contract.

37.   In response, on July 15, 2021, Wood submitted a revised claim to Grace for $1,973,538.88 that accounted for Wood's additional costs incurred due to Grace's design changes, and Wood's costs associated with the suspension and Grace's termination.  In October 2021, Wood revised its claim to $1,937,147.

38.   Over a year after suspending Wood's work, on December 17, 2021, Grace terminated the Contract for convenience pursuant to Section 15.2 of the Contract.

39.   Section 8 of the Contract entitles Wood to additional compensation and extensions to the schedule for changed work for reasons beyond its control.  Grace acknowledged that its design changes in Bulletin 1 impacted Wood's work, and Wood demonstrated that the design changes caused Wood to suffer delays and incur additional costs.  Notwithstanding, Grace has refused to pay Wood for its additional work and delay costs that resulted from Grace's deficient design.

40.     Section 15.3 of the Contract entitles Wood to be paid for all work performed through the effective date of the suspension and any demobilization costs resulting from the suspension.  Despite Wood's entitlement to these costs, Grace has refused to pay Wood for the work it performed prior to November 29, 2020 and its demobilization costs.

41.     Section 15.2 of the Contract entitles Wood to be paid for all work it performed based on the fair value of the work completed and accepted by Grace, and any work satisfactorily in progress.  Despite Wood's entitlement to these costs, Grace has refused to pay Wood the fair value of its work.

## COUNT I – BREACH OF CONTRACT

42.     Wood hereby incorporates by reference the averments of Paragraphs 1 through 41 as if set forth fully herein.

43.     The Contract is valid and enforceable.

44.     The Contract obligated Grace to, among other things, grant Wood additional compensation and an adjustment to the schedule if Wood's cost of or time for performance of its work was impacted by changes beyond Wood's control.

45.    Grace has failed to provide Wood the cost and schedule adjustments as required by the Contract.

46.    Grace breached the Contract by failing to grant Wood adjustments to the Contract and failing to compensate Wood for the increases in Wood's cost of and time for performance of its work caused by changes beyond its control

47.    The Contract also obligated Grace to, among other things, pay Wood certain costs associated with the suspension of Wood's work and the termination for convenience of the Contract.

48.    Grace has failed to pay Wood the costs to which it is entitled after Grace suspended Wood's work on the Project, and after Grace terminated the Contract for its convenience.

49.    Grace breached the Contract by failing to pay Wood the costs to which it is entitled concerning Grace's suspension of Wood's work and termination of the Contract for its convenience.

50.    All conditions precedent to payment have been satisfied or waived.

51.    As a result of Grace's breaches, Wood suffered damages in excess of $75,000.

**WHEREFORE**, Plaintiff Wood Environment & Infrastructure Solutions, Inc. respectfully requests judgment in its favor and against Defendant W.R. Grace & Co. – Conn. in an amount in excess of $75,000, as well as interest, costs of suit, and other such relief as the Court deems proper and just under the circumstances.

### COUNT II – VIOLATION OF THE
### MARYLAND PROMPT PAYMENT ACT, MD. CODE REAL PROP. §§ 9-301 ET SEQ.

52.    Wood hereby incorporates by reference the averments of Paragraphs 1 through 51 as if set forth fully herein.

53.    On or about October 12, 2021, Wood requested payment arising from additional costs Wood incurred to account for Grace's design changes, suspension of Wood's work, and subsequent termination of the Contract for convenience ("Final Payment").  Wood requested payment from Grace in the amount of $1,937,146.81.

54.    Wood is entitled to the additional compensation for changes to the work under Section 8 of the Contract.

55.    Wood is entitled to compensation arising from Grace's suspension of Wood's work under Section 15.3 of the Contract.

56.    Wood is entitled to compensation arising from the termination of the Contract for convenience under Section 15.2 of the Contract.

57.    Pursuant to the Contract, payment for the Final Payment was due from Grace within 60 days, or by December 11, 2021.

58.    Grace has failed to pay Wood the amounts it is owed for its Final Payment.

59.    Grace has not provided any justifiable reasons for withholding payment to which Wood is entitled under Sections 8, 15.2, and 15.3 of the Contract.

60.    Wood is entitled to prompt payment of all amounts it is owed for its work under the Contract pursuant to the Maryland Prompt Payment Act, Md. Real Prop. Code §§ 9-301 et seq.

61.    Grace's failure to timely pay Wood the amounts it is owed as Final Payment is a violation of the Maryland Prompt Payment Act.

62.     Under the Maryland Prompt Payment Act, Grace is liable for the amount of money owed to Wood, plus interest from the date the amount owed was due and any reasonable costs incurred.

**WHEREFORE**, Plaintiff Wood Environment & Infrastructure Solutions, Inc. respectfully requests judgment in its favor and against Defendant W.R. Grace & Co. – Conn. in an amount in excess of $75,000 and hereby requests interests, penalties, attorneys' fees, and other such relief as this Court determines is proper and just under the circumstances.

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

*/s/ Hailey P. Barnett*
Hailey P. Barnett
Georgia Bar No. 284342
hailey.barnett@troutman.com
600 Peachtree Street NE
Suite 3000
Atlanta, GA 30308
Tel:  404.885.3000

Michael P. Subak
*pro hac vice application forthcoming*
Michael.Subak@troutman.com
Eighteenth and Arch Streets
3000 Two Logan Square

Philadelphia, PA 19103
Tel: 215.981.4503

*Attorneys for Plaintiff*
*Wood Environment & Infrastructure*
*Solutions, Inc.*

Dated:  August 15, 2022

# EXHIBIT A

# Environmental & Remediation Services Agreement

1. It is hereby agreed the 30ᵗʰ day of December, 2019, between W.R. Grace & Co.-Conn., (herein called "Grace") and Wood Environment & Infrastructure Solutions, Inc. having its primary office at 1105 Lakewood Parkway, Suite 300, Alpharetta, GA, 30009 (herein called "Contractor") that Contractor will, as an independent contractor, provide the Work (as defined below) to Grace pursuant to Purchase Orders in conformity with terms hereof and the attached Exhibits, which are incorporated by reference and made part hereof (collectively, the "Agreement").

**ALL PURCHASE ORDERS ISSUED PURSUANT TO THE WORK SHALL BE INCORPORATED BY REFERENCE INTO THIS AGREEMENT. IF THERE IS A CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER DOCUMENT FORMING A PART OF THIS AGREEMENT, THIS DOCUMENT SHALL CONTROL. ANY CONTRACTOR'S STANDARD TERMS AND CONDITIONS AND ANY OTHER CONTRACTOR DOCUMENTS ARE HEREBY REJECTED BY GRACE AND AGREED BY CONTRACTOR TO BE VOID UNLESS EXPRESSLY AGREED TO IN WRITING BY GRACE. ISSUANCE OF THIS AGREEMENT IN NO WAY OBLIGATES GRACE TO GUARANTEE ANY MINIMUM QUANTITY OF WORK, OR TO PURCHASE ANY MINIMUM QUANTITY OF GOODS OR SERVICES.**

2. **SCOPE/FEES –**
   2.1   Contractor will provide the services, including any reports, documentation, materials and/or other deliverables (collectively, the "Work") described in any statement of work ("Statement of Work") attached to and made a part of this Agreement. Contractor will provide all Work in accordance with the applicable specifications ("Specifications") set forth in the Statement of Work and in Exhibit A, and will include the deliverables ("Deliverables") set forth in Exhibit B, which shall be part of the Work. Time is of the essence with respect to the Work performed by Contractor.
   2.2   Unless otherwise expressly noted herein or in the Statement of Work, the fees and prices for the Work stated in Exhibit C ("Fees") shall comprise the entire compensation for the Work hereunder, and shall include all taxes and charges, and no additional charges shall apply or be charged to Grace (including reimbursement of any expenses). Discounts and other incentives on the Fees are set forth in Exhibit D.

3. **TERM -** The term of this Agreement shall be from December 30, 2019 through December 31, 2020, unless terminated in writing by either party pursuant to the terms herein, or extended by the written agreement of the parties. Notwithstanding the foregoing, if Contractor has proceeded with a Statement of Work, but has not been completed the Work prior to the expiration of the Term, the Term shall be extended for purposes of such Statement of Work only until the Work associated with that Statement of Work is complete (subject to termination rights in this Agreement).

4. CONTRACT PRICE AND CONTRACT SCHEDULE –
   4.1   In full consideration for the Work to be performed by Contractor under this Agreement in accordance with the "Contract Schedule" attached to each Work Order, Grace shall pay Contractor the amount determined in accordance with Exhibits C and D pursuant to the terms in Exhibits E and F (the "Contract Price").
   4.2   As a condition to receipt of progress payments and final payment, Contractor shall submit conditional and unconditional lien/claim waivers executed by Contractor and all subcontractors as follows: Commencing with the first progress payment application, Contractor shall submit to Grace a lien/claim waiver form acceptable to Grace that provide conditional releases of all lien and claim rights for all Work performed through the end of the pay period and the then current progress payment application amount, and starting with the second payment application, unconditional releases for all Work performed through the end of the prior pay period and for all previous payments in prior pay periods, as well as evidence of payments made through the last payment cycle to subcontractors and suppliers. For avoidance of doubt, for final payment under this Agreement, Contractor shall submit a conditional release of all lien and claim rights for all Work performed, conditioned only on the check clearing and, within 3 days of the check clearing, Contractor shall submit an unconditional release of all lien and claim rights. Contractor's applications for payment shall be accompanied by similar conditional and unconditional lien and claim waivers executed by all subcontractors. Such waivers shall reflect waiver of right to a lien, stop notice, other claim, or any right against a bond relating to the Work. In the event the property where the Work is performed is not owned by Grace, the actual property owner shall also be named as a beneficiary of the progress payment and final payment lien/claim waivers.

5. **PERSONNEL -**
   5.1   Contractor shall employ for Work hereunder personnel who possess the necessary qualifications to perform their Work, who are legally eligible to work in the country in which the work will be performed, and who are over the age of eighteen. Contractor shall not knowingly assign any person to perform Work on any Grace premises who has been convicted of either a felony or a misdemeanor involving a crime of moral turpitude (or the local equivalent of similarly serious crimes). Grace reserves the right to reject the participation in the Work of any worker provided by Contractor. Contractor shall assign to the Work a competent representative satisfactory to Grace who shall be responsible for supervision of the Work and communication with Grace. All instructions given such representative by Grace shall be binding. Instructions will be confirmed in writing upon request. Such representative shall remain as the supervisor for the Work unless (a) Grace requests or agrees to such removal or (b) such representative ceases to be employed by Contractor. Contractor is fully responsible for the errors, acts, and omissions of all individuals directly or indirectly employed by it or any of its subcontractors or its sub-subcontractors.
   5.2   Contractor shall obtain prior approval from Grace for any visits of Contractor and Contractor's subcontractor or agent personnel to Grace locations. Contractor shall provide Grace any pertinent information necessary for Grace to comply with any applicable export regulations or trade sanctions in conjunction with such visits or the Work hereunder.
   5.3   THE TREATMENT AND CARE OF INJURIES SUSTAINED BY CONTRACTOR'S PERSONNEL, AND CONTRACTOR'S SUBCONTRACTORS' AND AGENTS' PERSONNEL, SHALL BE AND REMAIN THE RESPONSIBILITY OF CONTRACTOR; HOWEVER, GRACE'S FIRST AID FACILITIES, ASSISTANCE AND/OR TRANSPORTATION MAY BE MADE AVAILABLE TO CONTRACTOR'S, AND CONTRACTOR'S SUBCONTRACTORS' AND AGENTS' PERSONNEL IN ROUTINE OR EMERGENCY CASES WHICH ARE THE DIRECT RESULT OF ACCIDENTS OCCURRING ON GRACE'S PREMISES. GRACE SHALL INCUR NO LIABILITY FOR, AND CONTRACTOR SHALL INDEMNIFY AND DEFEND GRACE AGAINST ANY CAUSES OF ACTION, CLAIMS,

LOSSES, LIABILITIES, COSTS (INCLUDING REASONABLE ATTORNEY'S FEES), DAMAGES, JUDGMENTS OR EXPENSES WHATSOEVER, ARISING IN WHOLE OR IN PART OUT OF THE FURNISHING OF SUCH FIRST AID FACILITIES, ASSISTANCE AND/OR TRANSPORTATION TO CONTRACTOR'S OR CONTRACTOR'S SUBCONTRACTORS' OR AGENTS' PERSONNEL OR OUT OF THE FAILURE TO FURNISH SUCH FACILITIES, ASSISTANCE OR TRANSPORTATION, EXCEPT TO THE EXTENT  SUCH CAUSES OF ACTION OR CLAIMS ALLEGE OR ARE BASED IN WHOLE OR IN PART UPON THE NEGLIGENCE OF GRACE.

## 6. WORK AREA –

6.1    CONTRACTOR SHALL NOT ENTER ANY AREA OF GRACE'S PREMISES OTHER THAN THE WORK AREAS DESIGNATED BY GRACE.  CONTRACTOR PERSONNEL ENTERING ANY AREA OF GRACE'S PREMISES OTHER THAN THE DESIGNATED WORK AREAS SHALL BE DEEMED NEGLIGENT AND SHALL CONSTITUTE A MATERIAL BREACH OF THIS AGREEMENT BY CONTRACTOR.  NOTWITHSTANDING ANY OTHER PROVISIONS HEREIN, CONTRACTOR SHALL INDEMNIFY, DEFEND AND HOLD GRACE AND AFFILIATED COMPANIES, AND THEIR RESPECTIVE OFFICERS AND EMPLOYEES HARMLESS AGAINST ANY CAUSES OF ACTION, CLAIMS, LOSSES, LIABILITIES, COSTS (INCLUDING REASONABLE ATTORNEY'S FEES), DAMAGES, JUDGMENTS OR EXPENSES WHATSOEVER INCLUDING, BUT NOT LIMITED TO, CLAIMS OR CAUSES OF ACTION WHICH MAY RESULT FROM ANY INJURY TO OR DEATH OF PERSONS, OR LOSS OF OR DAMAGE TO PROPERTY ARISING OUT OF OR AS A RESULT OF ANY BREACH BY CONTRACTOR OF THIS SECTION, EXCEPT TO THE EXTENT THAT CONTRACTOR PROVES THAT SUCH INJURY, DEATH, LOSS, OR DAMAGE IS THE RESULT OF GRACE'S WILLFUL MISCONDUCT.

6.2    Contractor has had an opportunity to inspect the Work Area, and shall not make any claim for additional compensation for the Work or extension of time for performance based on the conditions found in the Work Area, unless such conditions could not have been discovered by Contractor based on a diligent inspection performed prior to the execution of this Agreement.

6.3    Contractor shall be aware of ongoing activities in the Work Area.  Other activities may include, but are not limited to, work being performed by other contractors on projects related or unrelated to the Work, daily operations and maintenance work by Grace, and other project work onsite. Contractor shall coordinate its Work with such ongoing activities in the Work Area in accordance with the Specifications and Grace. Should Contractor's Work be delayed due to failure of Grace or its other contractors to promptly remove such personnel, materials, equipment, tools, or other items from the Work Area, Contractor shall be entitled to a Change Order for time and equitable compensation to the extent that such delay impacts a critical path of the Contract Schedule.

6.4    Contractor shall be responsible for keeping the Work Areas in which it is performing Work free of debris and for protecting its Work, equipment and materials, whether furnished by Grace or Contractor, from loss or damage from any cause whatsoever, until Final Acceptance of the Work (as defined in Section 14 below).  Any equipment or material furnished by Grace shall be the responsibility of Contractor, and Contractor shall bear the expense of replacement or repair in the event of loss or damage to such material and equipment.

6.5    Contractor shall not connect to, use, or consume any utility, equipment or material of Grace except as expressly provided herein or in any Statement of Work, or pursuant to written permission granted by Grace.

6.6    Before commencement of Work, Contractor will exercise due diligence in (a) researching and obtaining Work site information from public sources  and (b) reviewing all information provided by Grace in connection with the location of subsurface structures (including, without limitation, pipes, tanks, cables and utilities) that could affect the Work. Furthermore, Contractor shall, at Contractor's cost, retain a professional utility locator ("Utility Locator") regarding the existence and location of any such subsurface structures.  Contractor shall be solely responsible for notifying appropriate third parties of such subsurface structures and obtaining markings from utilities before commencing any Work. If the Utility Locator locates subsurface utilities not previously identified on information provided by Grace, then, to the extent the existence of such utilities adversely impacts the Contract Schedule and/or Contract Price, then the Contractor will be entitled to a Change Order.

6.7    During and at the conclusion of the Work, Contractor shall, as applicable, remove all of its waste, equipment, tools and other materials from the Work Area, leaving the Work Area in "broom clean" or equivalent condition.  Contractor's obligations under this Agreement shall not be considered complete nor shall final payment be due from Grace until Contractor has cleaned up a project site to the satisfaction of Grace, including but not limited to disposal of debris and waste, equipment, materials and the capping and closing of wells, all in accordance with applicable laws and regulations.  Contractor shall not use any waste receptacles other than those specifically designated by Grace for use by Contractor.

6.8    For waste resulting from Contractor's performance of the Work that requires disposal of hazardous, radioactive or TSCA waste, Contractor shall manage the waste according to the project specifications. Contractor will not self-perform but is responsible for subcontracting with a properly qualified and appropriately licensed subcontractor to remove and dispose of asbestos and other hazardous materials and shall be liable for such subcontractor's proper performance of this portion of the Work.

## 7.  WARRANTY -

7.1    Contractor warrants that (a) all Work shall be performed in a careful, professional and workmanlike manner, consistent with industry standards and in accordance with all applicable laws; (b) all Work will conform to applicable Specifications and will be free from deficiencies and defects in materials, workmanship, design and/or performance; (c) it has the requisite capability, experience, sufficient and qualified personnel, registrations, quality assurance plans, government approvals, ownership, rights, permits, and licenses to perform its obligations under this Agreement hereby as contemplated hereby and to grant to Grace all rights with respect to the Work free and clear from any and all liens, adverse claims, encumbrances and interests of any third party; (d) the Work will not violate, infringe, or misappropriate any patent, copyright, trademark, trade secret, or other intellectual property or proprietary right of any third party; and (e) there are no pending or threatened lawsuits, claims, disputes or actions: (i) alleging that any Work infringes, violates or misappropriates any third party rights; or (ii) that may adversely affecting any Work or Supplier's ability to perform the Work or its obligations hereunder.

7.2    If any Work or any Deliverables, material or equipment furnished is found to be defective within twelve (12) months from the date of Final Acceptance of the Work, Grace shall notify Contractor in writing of such defective work identified within such 12 month period and Contractor shall promptly, not to exceed 10 days from Grace's notice, re-perform or remedy such defective Work or repair or replace such defective Deliverables, material or equipment, all at Contractor's expense, including but not limited to all costs associated with the removal, replacement and reinstallation of non-defective Deliverables, material or equipment that must be removed, replaced, or

reinstalled as a result of the defective work.  Contractor shall promptly notify Grace of any defects or quality problems relating to the Work, including any Deliverables, material or equipment furnished by Contractor or its subcontractors or agents.

8.  **CHANGE ORDERS** - Grace may request changes to the Work by providing written notice to Contractor.  Contractor shall, within five (5) business days of receipt of such notice, provide Grace with a written change order proposal ("COP") specifying any additional compensation and/or adjustment to schedule it seeks for the change.  No additional time or compensation shall be given or paid unless the COP is timely provided Contractor shall be entitled to additional compensation and adjustment to the Schedule for additional costs and delays in Contractor's performance resulting from causes beyond the reasonable control of Contractor, to include third party interference.  Contractor shall notify Grace within twenty-four hours of the time of the occurrence of any changes to, or changed conditions relating to, the Work that Contractor considers extra Work or grounds for adjustments to Contract Price or Contract Schedule.  No claim for additional time or compensation shall be valid unless authorized in writing by Owner, whether through a change order or a change directive (requiring only Grace's signature and subject to negotiation of the adjustment in time and compensation).  A change directive shall be a written directive to proceed with changed work to be used if the parties are unable to promptly agree on an adjustment in Contract Price and/or Contract Schedule, so as not to delay the progress of the Work.  Once the parties agree to an adjustment in Contract Price and/or Contract Schedule in connection with such change directive, the parties shall sign a Change Order.  If the parties cannot agree, then Contractor shall be entitled to compensation based on a T&M basis for such changed work.  Once signed by both parties, change orders are not subject to further negotiation and Contractor waives any and all rights to additional time and compensation in connection with that change.  Contractor shall comply with any other documentation requirements reasonably requested by Grace relating to change orders.

Should Contractor encounter subsurface or otherwise concealed physical conditions that differ materially from those ascertainable from a reasonable site investigation, then Contractor shall promptly (not to exceed 7 days from Contractor's knowledge) provide notice to Grace thereof and Grace shall promptly investigate such conditions.  If agreed by Grace, the Contractor shall be entitled to an adjustment in Contract Price and/or Contract Schedule.  In the event no change order is agreed to by the parties, Contractor shall diligently, and without delay, proceed with the Work and may make a claim as provided under this Agreement.

9.  **PERMITS AND LICENSES; COMPLIANCE WITH LAWS** - Contractor shall, at its expense, possess or obtain all permits, licenses, and other forms of documentation, pay all governmental fees, and comply with all federal, state, local and other laws, ordinances, rules, regulations and orders applicable to Contractor's performance hereunder.  Without charge to Grace, Contractor shall furnish to Grace copies of such permits, licenses, and other forms of documentation, together with any certificates or other instruments reasonably related to the performance of Contractor of its obligations under this Contract, prior to commencement of Work hereunder.  Contractor shall promptly notify Grace if Contractor loses its permitted or licensed status, or if Contractors fails to comply with any applicable law, ordinance, rule, regulation or order.  CONTRACTOR SHALL INDEMNIFY AND HOLD GRACE AND ITS AFFILIATED COMPANIES, AND THEIR RESPECTIVE OFFICERS AND EMPLOYEES HARMLESS FROM AND AGAINST ANY CAUSES OF ACTION, CLAIMS, LOSSES, LIABILITIES, COSTS (INCLUDING REASONABLE ATTORNEY'S FEES), DAMAGES, JUDGMENTS OR EXPENSES WHATSOEVER TO THE EXTENT ARISING OUT OF ANY CLAIM OR ALLEGATION THAT CONTRACTOR DID NOT POSSESS OR OBTAIN ANY NECESSARY PERMIT OR LICENSE, OR FAILED TO COMPLY WITH ANY APPLICABLE LAW, ORDINANCE, RULE, REGULATION OR ORDER.  If any law changes after execution of this Agreement, and such change requires Contractor to change the Work which adversely impacts the Contractor, then the Owner shall issue a Change Order adjusting the Contract Price and/or Contract Time, as appropriate.

10.  **CONFIDENTIALITY** -
10.1  Contractor shall comply with and shall require and ensure that all of its subcontractors and agents comply with the requirements in this Section 10.
10.2  Grace owns or controls confidential and proprietary information relating to its businesses and operations (said information hereinafter referred to as "Grace Information"), and may during the term of this Agreement directly or indirectly disclose to Contractor certain Grace Information relating to the Work and the purposes of this Agreement.  During the term of this Agreement, and continuing until the tenth (10th) anniversary of the date of expiration or termination of this Agreement, Contractor shall treat as confidential and shall not, without Grace's prior written consent, divulge to any third party or, except to the extent necessary for Contractor's performance hereunder, make any use of any Grace Information or information derived therefrom.  Without limitation of the foregoing, Contractor shall not discuss any Grace matters or the Work with any government employee, regulator or other third party supervising the Work herein without express written permission from Grace.
10.3  The Work and the Deliverables shall be considered work for hire and thus the property of Grace, and shall be considered Grace Information subject to the restrictions provided in this Section 10.  Notwithstanding the foregoing, should the Work or the Deliverables contain any of Contractor's intellectual property existing prior to the date of this Agreement or the applicable Statement of Work, the intellectual property rights in such Work or Deliverables shall continue to remain vested in Contractor, and Contractor hereby irrevocably grants to Grace a non-exclusive license to use such intellectual property for the purposes of this or any other project for which the Work and/or Deliverables were provided.
10.4  Except as provided in Section 10.3, above, Grace Information shall not include, and the restrictions provided in this Section 10 shall not apply to (a) information that at the time of its disclosure or development hereunder is, or thereafter becomes other than by act or omission of Contractor, part of the public domain; (b) information that Contractor can show was in Contractor's possession in tangible form at the time of disclosure or development hereunder and was not acquired, directly or indirectly, from Grace; or (c) information that was received by Contractor after the time of disclosure by Grace or development hereunder from a third party who has a lawful right to disclose it to Contractor and who did not require Contractor to hold it in confidence.  Specific disclosures made to the Contractor hereunder shall not be deemed to be within the foregoing exceptions merely because they are embraced by general disclosures, in the public domain, or in the possession of the Contractor.
10.5  Contractor shall provide the originals of all drawings, designs, calculations, etc., it used or developed hereunder to Grace, provided that Contractor may retain one copy for its files.  The expense of Contractor's copy is considered part of the cost of the Work.
10.6  Contractor will not, without the prior written consent of Grace from time to time, use Grace's name in connection with any publicity, release, advertisement, or other publication.
10.7  Contractor will not disclose to Grace any information of a confidential nature and all information disclosed by Contractor to Grace under the Agreement shall be deemed to be non-confidential, unless covered by a specific written confidentiality agreement.

Contractor warrants that the possession, use and/or disclosure of such information by Grace shall not violate the proprietary rights of Contractor or any third party.  If, based on its possession, use and/or disclosure of such information, Grace is charged with misuse of any such proprietary rights of any third party, Contractor shall indemnify, defend, and hold Grace harmless from any causes of action, claims, losses, liabilities, costs (including reasonable attorney's fees), damages, judgments or expenses whatsoever.

11. **CONTRACTOR-SUPPLIED CHEMICALS** – Contractor shall obtain Grace's approval prior to bringing any chemical (regardless of volume) onto Grace's premises. To request this approval, Contractor must provide a Safety Data Sheet (SDS) for each chemical Contractor or its subcontractor or agent plans to bring onto Grace's premises.  Upon review of the SDS, Grace will notify the Contractor whether it approves bringing the chemical onto Grace's premises. All chemicals must be clearly labeled.  Each label must contain:  the chemical identity, appropriate hazard warnings and classifications, and the name and address of the manufacturer or importer.  SDSs supplied by Contractor shall comply with legal requirements in effect at the location of the Grace premises at the time of performance of Work, in particular, the OSHA Hazard Communication Rule or the Globally Harmonized System of Classification of Chemicals, as applicable.

12. **SAFETY -**

12.1 Contractor shall comply with and shall require and ensure that all of its subcontractors and agents comply with the requirements in this Section 12.

12.2 Contractor personnel shall (1) comply with all requests, rules, regulations and procedures of Grace relating to safety and health, personal and professional conduct (including general safety practices or procedures), including but not limited to any set forth in this Agreement; (2) refrain from referring to themselves as Grace employees; and (3) otherwise conduct themselves in a professional and businesslike manner.  Contractor shall notify and train its personnel with respect to all such requests, rules, regulations and procedures, and shall require its personnel to attend any training specified by Grace.  If Grace notifies Contractor that a particular person, subcontractor or agent is not conducting himself, herself or itself in accordance with this section, Contractor will promptly remove the party from the Work at Grace's request.

12.3 Unless otherwise agreed in writing, Contractor shall supply all health or safety equipment or materials used or required by it in its performance of the Work.  Contractor will ensure that all of its personnel performing Work on Grace premises are sufficiently proficient in reading and writing in English (or the local language if outside the U.S.) to fully understand all safety-related information, rules, cautions and procedures.

12.4 In the event of any accident or near-miss incident, Contractor shall notify Grace as soon as practical, not to exceed 2 hours, , shall complete or assist Grace in completing Grace's accident or near-miss incident report form within 24 hours, and shall within 30 days of any accident furnish Grace a copy of all accident reports.  If Grace notifies Contractor of any noncompliance with any safety-related term or rule, Contractor shall take action immediately, if so directed, and make all reasonable efforts to correct the non-complying condition.  If Contractor fails to do so, Grace may stop all or any part of the Work.  No part of the time lost due to any such Work stoppage shall be the basis for extension of time or for a claim of reimbursement of additional costs or damages by Contractor.

12.5 Where plant security access control cards are supplied by Grace to Contractor personnel prior to entry to the plant site, Contractor is required to collect and return to Grace any ID cards within a time period defined by plant security procedures/guidelines.  A fee will be assessed against Contractor for each ID card not returned to Grace.

12.6 The manufacture, possession, use, dispensation, transportation, sale, distribution and storage of illegal drugs or other mind-altering substances (including misused prescription drugs), and the manufacture, possession, use, dispensation, transportation, sale, distribution and storage of alcohol is strictly prohibited on Grace premises, during Grace-sponsored activities, in Grace-supplied vehicles, or while conducting the Work.  Contractor personnel are prohibited from performing the Work while under the influence of such substances. In addition, Contractor shall comply with any site-specific drug and alcohol policies.  All persons on Grace's premises (including parking areas) are subject to inspection of their clothing, vehicles and personal effects at any time at the discretion of Grace. Suspected violators will be immediately escorted off Grace's premises and, if appropriate, reported to law enforcement authorities.

Contractor shall have an anti-drug program.  At a minimum, this program must contain the following elements:

(a)  Pre-Employment Testing - The Contractor must maintain records that verify that each person has urine drug-tested negative for amphetamines, barbiturates, benzodiazepines, cocaine, marijuana, methadone, methaqualone, opiates, phencyclidine and propoxyphene within 90 days prior to entering Grace's premises.

(b)  Post-Accident Testing shall occur no later than 32 hours after any event which results in (i) an OSHA recordable injury or a near-miss incident; (ii) a D.O.T. reportable incident; or (iii) damage to Grace's or Contractor's property.

(c)  Contractor personnel shall be substance-tested when there is reasonable cause to believe that such person has used or is using a prohibited substance.  The decision to test for cause will be determined by Contractor or Grace's representative.  Contractor personnel tested for cause will not be permitted access to Grace's premises pending receipt of the test results.

(d)  The anti-drug program must be supervised by a licensed physician.

(e)  A recognized Chain of Custody Procedure and laboratory certification program will be utilized.

(f)  Contractor personnel performing Work covered by D.O.T. regulations will be required to comply with a drug program as set out by applicable federal regulations.

Grace may periodically audit Contractor's records to verify that the above requirements are being met and Contractor shall cooperate with such audit at no cost to Grace.

13. **INSPECTION** – Grace's representatives may monitor or inspect any aspect of the Work, materials, or Contractor personnel's qualifications to determine the fulfillment of Contractor's obligations hereunder, but this shall not constitute approval of the Work or Final Acceptance of the Work on the part of Grace.

14. **FINAL ACCEPTANCE** - When Contractor considers it has met all contractual obligations concerning the Work (except for any continuing obligations established hereunder, such as the materials, equipment, and workmanship warranties as provided in Section 7), Contractor shall notify Grace in writing and shall provide all supporting documents in accordance with Section 4.2 hereof.  Grace will issue a letter of Final Acceptance where appropriate, but in no case will such Final Acceptance relieve Contractor of its obligations hereunder, including

the material, equipment, and workmanship warranties covered in Section 7 above, and any other obligations of the Contractor that may be outstanding.

15.  **TERMINATION** -

15.1    Should Contractor become insolvent or bankrupt, Grace may terminate this Agreement upon written notice to Contractor.  Should Contractor breach this Agreement, and thereafter either fail to start remedying such breach within five (5) days after written demand by Grace or fail to cure such breach within thirty (30) days after such written demand, Grace may terminate this Agreement.  Upon any such termination, Contractor shall be compensated for all completed and accepted Work then performed based upon the fair value of the Work completed and accepted in relation to the total compensation due hereunder, less amounts due by the Contractor to Grace as a result of the default, including replacement contractor costs, attorneys and expert fees.  If Grace's damages exceed the amount otherwise due Contractor, the Contractor shall promptly pay such damages to Grace.

15.2    Grace reserves the right to terminate this Agreement or any Work authorized by order hereunder at any time for Grace's convenience upon notice in writing to Contractor without penalty, provided that should the Work be so cancelled by Grace, Contractor shall be paid for all Work performed based upon the fair value of the Work completed and accepted by Grace, and any Work satisfactorily in progress, in relation to the total compensation due hereunder, less any amounts due by the Contractor to Grace.

15.3    Grace reserves the right to suspend the Work upon ten (10) days written notice to Contractor (unless Contractor agrees in writing to a shorter notice period) without penalty, provided that Contractor shall suspend the Work as soon as practical notwithstanding the ten-day notice period. Should the Work be so suspended, Contractor shall be paid for all Work performed through the effective date of the suspension, including any demobilization costs.  If and when the suspension is lifted, Grace shall compensate the Contractor for remobilization, if applicable.

15.4    Contractor may terminate this Agreement immediately in writing if Grace becomes insolvent, enters bankruptcy, receivership, or other like proceeding (voluntary or involuntary) or makes an assignment for the benefit of creditors.

15.5    Contractor may terminate this Agreement for nonpayment of undisputed amounts by Grace in excess of 30 days past the agreed upon payment terms, after Contractor has notified Grace in writing of said outstanding balances and Grace has failed to cure outstanding balances, within 30 days from receipt of such notice.

15.6    All provisions of the Agreement that, by their nature, should survive expiration or termination of the Agreement or Final Acceptance of the Work shall survive.

16.  **DAMAGES** –

16.1    Except with respect to third party claims that are subject to the indemnification provisions hereunder, any Intellectual property related claims, and in the event of gross negligence or intentional misconduct, neither Contractor nor Grace shall be liable to the other for any loss of profits, loss of business, or any punitive, special, incidental or indirect damages arising hereunder.

16.2    In the event of force majeure delays, Contractor shall be entitled to a reasonable extension of the contract time.  Contractor shall be entitled to an equitable adjustment in compensation from Grace to the extent such delays cause Wood direct and documented costs.

16.3    If the completion of the Work or any part thereof is delayed due to reasons caused by Contractor and Contractor is not able to meet any agreed delivery date (except in the event of force majeure), then Contractor shall pay to Grace an amount equal to $1,500 per day until the delivery date has been achieved (the "Liquidated Damages"). The parties agree that the harm caused to Grace by such a delay would be difficult to accurately estimate as of the Effective Date, and that Liquidated Damages are a reasonable estimate of the anticipated or actual harm that might arise from such a delay, and not a penalty.  Liquidated Damages shall become due upon Grace's written notification to Contractor and may be set off by Grace against the Fees payable for the Work.  Such Liquidated damages shall be Grace's sole remedy against Contractor for delays in the Work caused by Contractor.  The amount of Liquidated Damages shall not exceed 10% of the contract value.

16.4    Overall Limitation of Contractor's Liability. TO THE MAXIMUM EXTENT PERMITTED BY LAW, GRACE AGREES THAT THE TOTAL AGGREGATE LIABILITY OF CONTRACTOR TO GRACE FOR ANY AND ALL CAUSES OF ACTION, INCLUDING, WITHOUT LIMITATION, CONTRIBUTION ASSERTED BY GRACE AND ARISING OUT OF OR RELATED TO THE NEGLIGENT ACT(S), ERROR(S) OR OMISSION(S) OF CONTRACTOR IN PERFORMING SERVICES, SHALL BE LIMITED TO ELEVEN MILLON FIVE HUNDRED THOUSAND DOLLARS ($11,500,000) OR THE TOTAL FEES ACTUALLY PAID TO CONTRACTOR BY GRACE UNDER THIS AGREEMENT, WHICHEVER IS GREATER ("LIMITATION").

17.  **INDEMNIFICATION** -

17.1    CONTRACTOR SHALL DEFEND, INDEMNIFY AND HOLD GRACE AND ITS AFFILIATED COMPANIES, AND THEIR RESPECTIVE OFFICERS AND EMPLOYEES HARMLESS FROM AND AGAINST ANY LOSSES, LIABILITIES, COSTS (INCLUDING REASONABLE ATTORNEY'S FEES), DAMAGES, JUDGMENTS OR EXPENSES WHATSOEVER ARISING OUT OF ANY CLAIM OR CAUSE OF ACTION INCLUDING, BUT NOT LIMITED TO, CLAIMS OR CAUSES OF ACTION BASED ON NEGLIGENCE, STRICT LIABILITY OR ABSOLUTE LIABILITY FOR (1) DESTRUCTION OF OR DAMAGE TO PROPERTY, INCLUDING CONTRACTOR'S OR SUBCONTRACTOR'S PROPERTY, (2) CONTAMINATION OF OR ADVERSE EFFECTS ON THE ENVIRONMENT, (3) ANY VIOLATION OF ANY GOVERNMENTAL LAWS, REGULATIONS OR ORDERS, OR (4) INJURIES TO OR DEATH OF PERSONS, INCLUDING CONTRACTOR'S EMPLOYEES, SUBCONTRACTORS, AGENTS OR ASSIGNS, BUT ONLY TO THE EXTENT CAUSED BY NEGLIGENT ACTS OR OMISSIONS AND WILLFULL MISCONDUCT OF CONTRACTOR OR ITS SUBCONTRACTORS OR AGENTS, AND SHALL, AT THE OPTION OF GRACE,  DEFEND GRACE AT CONTRACTOR'S SOLE EXPENSE IN ANY LITIGATION INVOLVING THE SAME, REGARDLESS OF WHETHER SUCH WORK IS PERFORMED BY CONTRACTOR, ITS EMPLOYEES, OR BY ITS SUBCONTRACTORS, AGENTS OR ASSIGNS, THEIR EMPLOYEES, OR ALL OR EITHER OF THEM; PROVIDED, HOWEVER, THAT SUCH INDEMNIFICATION AND HOLD HARMLESS SHALL NOT APPLY TO (1) CLAIMS FOR LOSS, DAMAGE, INJURY, OR DEATH (OTHER THAN LOSS OF, DAMAGE TO, OR LOSS OF USE OF CONTRACTOR'S PROPERTY) WHEN  SUCH CLAIM HAS BEEN CAUSED BY THE NEGLIGENCE OF GRACE; AND (2) CLAIMS FOR LOSS, DAMAGE, INJURY, OR DEATH (INCLUDING LOSS OF, DAMAGE TO, OR LOSS OF USE OF CONTRACTOR'S PROPERTY) WHEN AND TO THE EXTENT IT IS PROVEN BY CONTRACTOR TO HAVE BEEN CAUSED BY THE NEGLIGENCE OR  WILFULL MISCONDUCT OF GRACE.

17.2    ANY DAMAGE TO OR LOSS OF CONTRACTOR'S OR ANY OF ITS SUBCONTRACTORS' EQUIPMENT SHALL BE BORNE BY CONTRACTOR, AND CONTRACTOR SHALL PROCURE INSURANCE TO COVER SUCH DAMAGE EXCEPT FOR DAMAGE OR LOSS CAUSED BY GRACE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

18. **LIENS AND OFFSETS**– Except to the extent that Grace has not timely paid Contractor undisputed amounts for Work performed under this Agreement, Contractor shall not record, and shall not permit any subcontractors to record, any liens against the property that is the subject of the project, and shall promptly pay all costs incurred by Contractor in performing the Work. If a lien is recorded, and provided that Grace has timely paid Contractor undisputed amounts for Work performed, Contractor shall, within 10 days of such recording, remove any such lien by bonding around the lien or other mechanism permitted by law. If payment or other disputes exist between Contractor and its subcontractors affecting Grace or the property that is the subject of the project, Contractor shall make good faith efforts to promptly and satisfactorily settle any such claims. If Contractor fails to settle such claims or bond around the lien within 10 days of Contractor's knowledge of the lien, then, Grace shall have the right, after notifying Contractor in writing, to settle such claims for the account of Contractor and deduct the amount thereof from amounts payable to Contractor. Contractor shall indemnify, defend, and hold Grace and its affiliated companies, and their respective officers and employees harmless from any losses, liabilities, costs (including reasonable attorney's fees), damages, liens, judgments or expenses whatsoever arising out of any claims or causes of action arising in any way from Contractor's failure to pay for services, labor, materials, supplies, equipment or any other item furnished directly or indirectly to Contractor or Grace for the Work hereunder, provided that Grace has timely paid Contractor for undisputed amounts for the Work that is the subject of such losses, liabilities, costs, damages, liens, judgments and/or expenses. If Contractor fails to timely remove any such lien in accordance with this Section 18, Contractor shall reimburse Grace for any and all collection costs and attorneys fees and all other costs and expenses incurred by Grace when enforcing its rights under this Section 18.

19. **TAXES –** All taxes that accrue as a result of performance by Contractor pursuant to this Agreement shall be the responsibility of Contractor. All such taxes shall be paid by Contractor to its suppliers or directly to the proper taxing authority in the manner prescribed by applicable law. No such taxes shall be passed through to Grace, or become the responsibility of Grace, unless expressly agreed in the applicable Statement of Work (in which case such taxes shall be listed separately on Contractor's invoices), provided that it shall remain the responsibility of Contractor to make timely remittance of such taxes to the proper taxing authority, and Contractor agrees to reimburse and to defend, indemnify and hold harmless Grace and its affiliates from any fines, penalties, liabilities, interest, assessments, costs (including reasonable attorneys fees), damages, judgments, or expenses whatsoever resulting from Contractor's failure to make such timely remittance, to properly invoice Grace for applicable taxes, or to pay any other taxes accruing as a result of performance by Contractor pursuant to this Agreement.

20. **SEPARATE CONTRACTORS** - Grace reserves the right to let contracts for other services, equipment, and materials in connection with or relating to the Work hereunder, and Contractor shall, without additional cost to Grace, coordinate its Work and cooperate with other contractors on the site. The presence of other contractors on the site and the stacking of crafts and trades shall not constitute any cause for Contractor's delay, disruptions, hindrances, inefficiencies, loss of productivity, overtime, or any failure to perform the Work.

21. **INSURANCE** - Contractor shall secure at its expense and have in have in force and maintain, at its expense until the first anniversary of the Final Status Survey associated with this project or final acceptance of Work, whichever is later, insurance sufficient to cover its obligations and potential liabilities hereunder with insurance companies with an AM Best Rating of A- VII (or equivalent) or better, including the following types and minimum insurance limits:
    21.1 Insurance that shall comply with all applicable Workers' Compensation and Occupational Disease laws and that shall cover all of Contractor's employees performing the Work. If any of the Work will involve operations on docks, wharves, piers, terminals or other installations on or adjacent to navigable waters within the territorial limits of the U.S.A., such insurance shall include coverage of claims under the United States Longshoremen's and Harbor Workers' Act.
    21.2 Employer's Liability Insurance shall be provided with a limit of not less than $1,000,000 per occurrence and $3,000,000 aggregate.
    21.3 General Liability Insurance with a combined single limit for personal injury and property damage of not less than $1,000,000 per occurrence and $5,000,000 aggregate. Such insurance shall include coverage for all liability assumed by Contractor under the terms of this Agreement with limits not less than those set out above, including but not limited to premises and operations liability, blanket contractual liability, products liability and completed operations liability (with coverage for completed operations to remain in effect for a period of at least three years following acceptance of the Work by Owner), broad form property damage liability and "X," "C," and "U" hazards (blasting, collapse and underground property damage) and personal injury.
    21.4 Automobile Liability Insurance with bodily injury and property damage coverage of not less than $1,000,000 per occurrence and $3,000,000 aggregate.
    21.5 Professional Liability Insurance in the amount of $1,000,000 per occurrence and $3,000,000 aggregate.
    21.6 Contractor's Pollution Liability insurance in the amount of $1,000,000 per occurrence and $3,000,000 aggregate.
    21.7 Umbrella coverage insurance with limits of $5,000,000.
    21.8 Such other insurance as Contractor considers necessary (at no additional cost to Grace).

    The insurance requirements listed above are established by Grace as minimum limits, and shall not to be considered as indicative of the ultimate amounts and types of insurance that Contractor may need, or any limitation on Contractor's potential liability arising hereunder. All insurance policies required of Contractor under the terms of this Agreement shall be written on policy forms and by insurance companies reasonably acceptable to Grace. Contractor shall furnish to Grace prior to commencement of Work certificates of insurance on forms reasonably acceptable to Grace for all such policies. Such certificates shall provide not less than 10 days' prior written notice to Grace in the event of cancellation or material change affecting Grace's interests and shall include a waiver of subrogation and a contractual liability endorsement in favor of Grace. Grace, any entity that owns the property that is the subject of the project and the United States shall be named as additional insured(s) and loss payees on all such policies, except for the professional liability policy. Neither failure to comply nor full compliance with this Section 21 shall limit or relieve Contractor from any obligations or liabilities arising hereunder.

    Contractor shall require each subcontractor and agent used by it in the performance of this Agreement to carry insurance coverage of the types and with the coverages detailed above, except for the umbrella coverage.

22. **INDEPENDENT CONTRACTOR -** Contractor is and shall remain an independent contractor in performing the Work under this Agreement. This Agreement shall not create a partnership, joint venture, or similar relationship between the parties, and neither Grace nor Contractor will have the authority to make statements, promises, representations or commitments binding on the other party. Contractor shall

determine the manner and means by which the Work is to be performed, and shall maintain complete control of its employees and operations incident to the proper performance and completion of this Agreement, including that of its subcontractors, agents and assigns. Neither Contractor nor anyone employed or engaged by it shall be, represent, act, purport to act, or be deemed to be the agent, representative, employee, or servant of Grace, nor shall Contractor or anyone employed or engaged by it be treated or be entitled to be treated as an employee of Grace for any purpose, including tax and Social Security coverage and withholding, or any Grace-provided employee benefits.

23. **FORCE MAJEURE** - Neither party shall be liable to the other for failure or delay in performance hereunder to the extent that such failure or delay is due to war, fire, strike, lockout, riots, request or suggestion of governmental authority, act of God, or other circumstances beyond the reasonable control of the affected party which interfere with the Work, which shall not include shortage of or increased costs of labor, materials or supplies. The party affected by such force majeure event shall promptly notify the other party of such force majeure event in writing, providing sufficient detail to describe the cause, scope and estimated duration of such force majeure event, and shall actively work to remedy the impact of such force majeure event so that it may resume performance hereunder.

24. **SURETY BOND** – Grace shall have the right to require Contractor to provide performance and payment bonds in the full amount of the Statement of Work from time to time in a form and with a corporate surety approved by Grace. The bond premium shall be included in the proposal for the Statement of Work. The Surety Bonds shall be presented to Grace prior to any Work being conducted under this Agreement.

25. **SUBCONTRACTORS** – Contractor shall not subcontract any of the Work hereunder or enter into any arrangement whereby another person or entity is to perform any of Contractor's obligations hereunder without the prior written consent of Grace. Any such consent by Grace shall not relieve Contractor of any of its obligations or liabilities under this Agreement and any Statement of Work, and Contractor shall be responsible for the acts, omissions, and performance of any subcontractor or agent. No subcontract of Contractor shall bind or purport to bind Grace, and each subcontract shall provide for its immediate termination in the event of termination of this Agreement. In each such subcontract or contract, Contractor shall require its subcontractors and/or agents to comply with terms identical to the terms herein (except where logically inapplicable), and in particular, Contractor shall require its subcontractors and agents to defend and indemnify Grace as Contractor is required to defend and indemnify Grace hereunder.

26. **STATUTORY EMPLOYER** – If any of the Work is to be performed in the State of Louisiana, acceptance of this Agreement by Contractor constitutes its recognition and agreement that a statutory employer relationship as envisioned by La. R.S. 23:1061(A), as amended by Act 315 of 1997 or any other similar laws, exists between Contractor and Grace with respect to the Work provided in Louisiana pursuant to this Agreement, as to Contractor's direct employees and its statutory employees; and that the work to be performed under this Agreement is an integral part of, or essential to, the ability of Grace to generate its own goods, products or services. The parties further acknowledge that this recognition is limited to the status of a statutory employer under the workers compensation law of Louisiana and is not intended to create any other rights or responsibilities of the parties or the employees of the Contractor.

   1. **EMPLOYER'S REGISTRATION NUMBERS AND CONTRACTOR'S LICENSE NUMBER** - Contractor is, and during performance hereof will continue to be registered as an employer under applicable federal and other laws, and Contractor's employer's registration numbers thereunder are:

      Federal   91-1641772                         State   Maryland

   Contractor's License No. State of Maryland 16469698

   2. **ASSIGNMENT -** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective assigns. This Agreement, or any part thereof, shall not be assigned, delegated, or otherwise transferred by either party without the prior written consent of the other (which consent shall not be unreasonably withheld or delayed); except that no such consent of the Contractor shall be required (a) when such transfer is in connection with the sale or other transfer of all or substantially all the assets of the business of Grace, or with the sale or other transfer of the assets of Grace to which this Agreement relates; or (b) the assignment of this Agreement by Grace to any of its affiliates. Any purported assignment or delegation in violation of this Section shall be null and void. In the event that Grace transfers or assigns its rights and obligations under this Agreement and no consent is required, Grace shall notify the Contractor of same.

29. **AUDIT** - Contractor shall maintain and, for a period of four (4) years following Final Acceptance of the Work or expiration or termination of this Agreement retain complete and accurate records of the Work performed hereunder, and all charges and other information related to this Agreement or the Work. Prior to the expiration of such four-year period, Grace shall have access to, and shall have the right to audit and copy all such records and information. Contractor shall cooperate fully with Grace in conducting such audits.

30. **ETHICS AND CONFLICTS OF INTEREST** - Contractor shall not, directly or indirectly, provide anything of value to any employee, agent or officer of Grace or its affiliates, or any designee of any such employee, agent or officer, or favor any such employee, agent or officer, or any designee of any such employee, agent or officer, with gifts or entertainment of significant cost or value or with services or goods sold at less than full market value.

31. **GOVERNING LAW** – This Agreement shall be governed by and interpreted according to the laws of the State where the Project is located, without regard to its conflicts of laws provisions.

32. **DISPUTE RESOLUTION -**
   32.1 The parties will use their best efforts to resolve any dispute, controversy, or claim (hereinafter, "dispute") arising from or in connection with this Agreement in a fair and equitable manner through negotiations. If the persons with direct responsibility for the administration of this Agreement are unable to resolve the dispute, either party may, upon written notice to the other party, request that more senior executives from both parties who have the authority to resolve the dispute meet in an attempt to resolve it. Within fourteen (14) days of

the delivery of the notice, the receiving party shall submit to the notifying party a written response. The notice and the response shall include (a) a statement of each party's position on the dispute, plus documentary support; and (b) the name and title of the executive who will represent that party and any other person who will accompany the executive to the meeting. Within thirty (30) days after delivery of the initial written notice, the parties' executives shall meet at a mutually acceptable time and place to attempt to resolve the dispute. If not resolved within 30 days of such meeting, either party may take the next step in the dispute resolution process. All reasonable requests for information made by a party shall be honored by the other party. All negotiations and offers made pursuant thereto shall be confidential, and shall not be receivable in evidence, either as an admission or otherwise, as relevant to the validity or invalidity of the dispute.

32.2 The parties waive the right to initiate any litigation until the initial written notice described above has been issued, and sixty days from the date such written notice was issued has passed without resolution of the dispute by the parties. Notwithstanding the foregoing, either party may seek a temporary injunction, restraining order, or other provisional judicial or equitable relief if the party in its sole judgment believes that such action is necessary to avoid irreparable injury or to preserve the status quo. Parties will continue to participate in good faith in the negotiations described above despite any request for provisional relief.

33. **WAIVER –** Grace's failure in any one or more instances to insist upon strict performance of any of the terms and conditions of this Agreement, or to exercise any right herein conferred shall not be construed as a waiver or relinquishment of that right or Grace's right to assert or rely upon that term or condition. Any express waiver of a term of this Agreement shall be not be binding and effective unless made in writing and properly executed by the waiving party.

34. **NOTICES** - All notices required or contemplated under this Agreement shall be effective upon receipt, and must be in writing and: (1) delivered personally; (2) sent delivered by a private, prepaid courier that maintains a log showing receipt of the document by addressee; or (3) sent by registered or certified mail, and addressed as follows:

| Grace | Contractor |
|---|---|
| W.R. Grace & Co.-Conn. | Wood, Environment & Infrastructure Solutions, Inc. |
| Attn: Legal Resources Center | Attn: Sarah L. Stitgen, Esq. |
| 7500 Grace Drive | 1105 Lakewood Pkwy., Suite 300 |
| Columbia, MD 21044 | Alpharetta, GA 30009 |
| gracelaw@grace.com | sarah.stitgen@woodplc.com |

35. **OWNERSHIP**. Except as set forth below with respect to Background Technology, and excluding where noted in the applicable Statement of Work, all Work and other work product developed for and/or delivered to Grace by Contractor in performing Work pursuant to this Agreement and/or any related Statement of Work, and any intellectual property related thereto, shall be "work made for hire" for Grace. Subject to the payment of all fees due under this Agreement, and subject to its terms and conditions, Contractor assigns its entire right, title and interest in the Work to Grace except as described below with respect to Background Technology. Grace grants to Contractor at no charge a non-exclusive perpetual right to use, market, develop or license such Work except as provided in the applicable Statement of Work and except as to licenses to third party products. This shall not limit Contractor's future use of ideas, concepts, know-how, methods, techniques, skill, knowledge and experience developed solely by Contractor in connection with this Agreement and related Statements of Work, except with regard to any Confidential Information of Grace (as outlined in Section 10 hereof).

The Work may include certain methodologies, development tools, processes, information, data, and materials developed or licensed by Contractor outside of and prior to this Agreement and related Statements of Work (the "Background Technology"). Contractor shall retain any and all rights Contractor may have in the Background Technology, but grants to Grace an irrevocable, non-exclusive, perpetual, fully paid-up worldwide license to use, execute, reproduce, display, translate, modify, improve, and distribute internally the Background Technology. Contractor shall identify all intellectual property that it intends to claim as Background Technology in the applicable Statement of Work with sufficient specificity to allow a person reasonably competent in the field to identify which components of the Work are included. Grace shall not license, sub-license, resell, transfer or make other commercial use of the Background Technology, or any portion thereof, without Contractor's prior written consent, except it may transfer, lease, assign or sublicense said license to any Grace affiliate, subsidiary or successor in interest.

36. **WARRANTY OF TITLE, WASTE OWNERSHIP** - Title to all hazardous materials pre-existing at the site shall remain with Grace. If the samples or wastes resulting from the Work contain any contaminants, Contractor, as Grace's agent, and at Grace's direction and expense, will either (i) return such samples or wastes to, or leave them with, Grace for appropriate disposal or (ii) using a manifest signed by Grace as generator and arranger, coordinate the transport of such samples or wastes to an approved facility selected by Grace for final disposal, using a transporter selected by Grace. At no time will Contractor assume possession or title, constructive or express, to any such samples or wastes. Grace agrees to pay all costs associated with the storage, transport, and disposal of samples and wastes.

37. **SEVERABILITY** - If any provision of this Contract, or the application thereof to any person or circumstances shall be invalid or unenforceable, for any reason and to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforceable to the fullest extent permitted by law.

38. **ENTIRE AGREEMENT; COUNTERPARTS; ACCEPTANCE OF FACSIMILE AND SCANNED SIGNATURES** - This Agreement, together with all exhibits and attachments, constitutes and contains the entire agreement between Contractor and Grace with respect to the subject matter herein, and supersedes all prior oral and written promises, agreements, representations or warranties relating thereto. No alteration or amendment of this Agreement will be effective unless it is in writing and signed by Contractor and Grace. The parties agree that this Agreement, agreements ancillary to this Agreement, and related documents to be entered into in connection with this Agreement (1) may be executed in separate counterparts, and each counterpart when so executed shall be deemed to be an original but which together shall constitute one and the same agreement; and (2) once executed, in counterpart or non-counterpart format, shall be effective in all respects as original hand-written signatures placed on hard copies when converted to an electronic format (e.g., .pdf) and then delivered to the other party(ies) by facsimile, scanned image, or as an attachment to electronic mail (e-mail). The parties may, but are not required to, exchange hard copy inked originals of their signatory copies of this Agreement, ancillary agreements and related documents.

**W.R. GRACE & CO.-CONN.**

By:

Name:     Chris Schult

Title:     Vice President, Strategic Sourcing

Date:     1/7/2020

**WOOD ENVIRONMENT & INFRASTRUCTURE SOLUTIONS. INC.**

By:

Name:     James A. Worcester

Title:     President, Construction and Remediation

Date:     12/30/2019

Environmental & Remediation Services Agreement

**Exhibit A**
**Specifications for Work (Including Statements of Work)**

ANY APPARENT CONFLICTS IN THE DRAWINGS AND/OR SPECIFICATIONS SHALL IMMEDIATELY BE BROUGHT TO THE ATTENTION OF GRACE FOR RESOLUTION.

No deviation from the Specifications is permitted without Grace's prior written permission.

*The services that Contractor is requested and agrees to perform (the "Services") may include, without limitation, the following: (a) engineering and technological consulting services relating to the environment; (b) environmental management, site assessment and environmental auditing; (c) analysis relating to assessments of property and management procedures; (d) geotechnical services including analysis, design, engineering and construction supervision; (e) design of site restoration; (f) air monitoring and engineering (g) environmental health and industrial hygiene consulting services (h) site remediation and construction (i) and field and laboratory services in support of the above.*

*Grace will provide access to such information as may be available including drawings and plans relating to the Site's subsurface structures. Contractor shall be entitled to reasonably rely upon the accuracy of such information provided by Grace.*

## Specifications List

| Document Name | Date | Author | General Description |
|---|---|---|---|
| Project Specifications 100% Utility and Pre-Demolition Design W.R. Grace FUSRAP Site, Curtis Bay, Maryland (including its attachments A through J) | March 2019 | EA Engineering, Science and Technology, Inc., PBC and Century Engineering | Specifications included in Request for Proposal |
| Grace, Curtis Bay Works Building 23, Southwest Quadrant Utility & Pre-Demolition Package 100% Construction Documents (Sheets 1 through 70) | 2019-02-26 | EA Engineering, Science and Technology, Inc., PBC and Century Engineering | Drawings included in Request for Proposal |
| Requests for Information (RFIs) from Bidders 100% Utility & Pre-Demolition Design for the Southwest Quadrant of Building 23, W.R. Grace FUSRAP Site, Curtis Bay Maryland | 17 May, 2019 | W.R. Grace & Co.-Conn. | Responses to bidder questions on Request for Proposal |
| Requests for Information (RFIs) from Bidders 100% Utility & Pre-Demolition Design for the Southwest Quadrant of Building 23, W.R. Grace FUSRAP Site, Curtis Bay Maryland | 24 May, 2019 | W.R. Grace & Co.-Conn. | Responses to bidder questions on Request for Proposal |
| Requests for Information (RFIs) from Bidders (3rd Group) 100% Utility & Pre-Demolition Design for the Southwest Quadrant of Building 23, W.R. Grace FUSRAP Site, Curtis Bay Maryland | 31 May, 2019 | W.R. Grace & Co.-Conn. | Responses to bidder questions on Request for Proposal |
| E-mail: Level of Effort for Health Physics Resources - Building 23 Utility & Pre-Demolition Work | 9/24/2019 | W.R. Grace & Co.-Conn. | Refinement on base health physics resource needs |
| E-mail: Summary/action items for structural and electrical design options for Building 23 | 9/30/2019 | W.R. Grace & Co.-Conn. | Clarification of various structural and electrical elements of work generally related to value engineering. |
| E-mail: WR Grace Response to Wood Mechanical Subcontractor Questions - Building 23 Pre-demo work | 10/30/2019 | W.R. Grace & Co.-Conn. | Responses to Wood questions of 10/21/19 clarifying certain requirements |
| E-mail: WR Grace Response to Electrical Subcontractor Questions - Building 23 Pre-demo work | 11/6/2019 | W.R. Grace & Co.-Conn. | Clarification of electrical tray infill and loading |

**Exhibit B**
**Deliverables**

Deliverables shall be as set forth in this Environmental & Remediation Services Agreement and Specifications (Exhibit A), including but not limited to procurement and installation of physical assets (including, but not limited to, structural improvements, production process and water management equipment, electrical equipment and utility supports) set forth in the specifications.  Deliverables shall be tracked in a form substantially equivalent to the following:

**GRACE**
Talent | Technology | Trust™

Project: _____
Location: _____
Contractor: _____

Contractor shall provide the following documents during Contract execution in accordance with the Contract documents.  Note, this list of documents has been developed for convenience and as a reference to the Contract documents.  This list shall be deemed to be followed by the phrase, 'without limitation' or 'but not limited to', if not indicated otherwise.

| | Technical Document Deliverables | Submitted By | Submitted To | Required Date | Timing or Frequency | Additional comments |
|---|---|---|---|---|---|---|
| 1 | Work Plan | | | | | |
| 2 | Contractor Quality Control Plan | | | | | |
| 3 | Health & Safety Plan | | | | | |
| 4 | Transportation Plan | | | | | |
| 5 | Waste Management Plan | | | | | |
| 6 | Equipment Operation and Maintenance Manuals (Including equipment warranties) | | | | | |
| 7 | Progress Reports (including meeting minutes and schedule updates) | | | | | |
| 8 | Remedial Action Report | | | | | |
| 9 | As-Built Drawings | | | | | |

and

**GRACE**
Talent | Technology | Trust™

Project: _____
Location: _____
Contractor: _____

Contractor shall provide the following documents during Contract execution in accordance with the Contract documents.  Note, this list of documents has been developed for convenience and as a reference to the Contract documents.  This list shall be deemed to be followed by the phrase, 'without limitation' or 'but not limited to', if not indicated otherwise.

| | Commercial Document Deliverables | Submitted By | Submitted To | Required Date | Timing or Frequency | Additional comments |
|---|---|---|---|---|---|---|
| 1 | Submittal Schedule/Register | | | | | |
| 2 | Insurance Certificate | | | | | |
| 3 | Payment & Performance Bond | | | | | |
| 4 | Project Organizational Chart (To include Contractor & Sub-Contractor contact information) | | | | | |
| 5 | Schedule of Values | | | | | |
| 6 | Payment Application with Back-Up Documentation (To include Change Requests and Change Orders) | | | | | |
| 7 | Contractor's Proposed Level 3 Detailed Schedule (For Review) | | | | | |
| 8 | Contractor's Reviewed Level 3 Detailed Schedule (Approved) | | | | | |
| 9 | Critical Path Activities Schedule | | | | | |
| 10 | 2-Week Look Ahead Schedule with Resource Loading | | | | | |
| 11 | Progress Payment Lien Waivers | | | | | |
| 12 | Final Payment Lien Waivers | | | | | |

**Exhibit C**
**Fees**

Fees as set forth in the Wood proposal dated 12/23/19 including, but not limited to, the bid form, unit rates and standard markups.  Contract pricing includes the following fixed price line items:

| | |
|---|---:|
| Submittals, Plans & Reports | 87,110.00 |
| Environmental Monitoring & Radiological Support | 798,635.00 |
| Payment & Performance Bond | 94,275.00 |
| Mobilization and Demobilization | 199,837.00 |
| Construction and Testing of New Substation #4 and Associated Electrical Lines | 3,809,697.00 |
| Re-Support and Rerouting of Utility Lines Along and Within the Southwest Quadrant | 2,902,338.00 |
| Installation of Structural Supports in Building 23 | 343,893.00 |
| Installation of two Pump Stations, Heaters, Mix Tank, and Associated Equipment in the Poly Plant | 1,970,766.00 |
| Re-Feed of Administration Building, Cafeteria Building, and Site Booster Pump | 68,733.00 |
| Installation of one (1) process piping stanchion using helical piers to demonstrate/test | 66,821.00 |
| Concrete slab at PS2 and Anti-flotation collar | 5,476.00 |
| **Total Contract Price** | **$10,347,581.00** |

Environmental & Remediation Services Agreement

**Exhibit D**
**Rebates, Prebates, Discounts, and Incentives**

**Intentionally left blank**

**Exhibit E**
**Invoicing and Payment**

Upon receipt of Grace's Order, and prior to the commencement of Work, Contractor must send an Order Confirmation to Grace via ARIBA. After the Work is provided, Contractor should send Grace proof of service completed to date allowing Grace to complete an accurate Goods Receipt. This will allow the Supplier to generate an invoice in ARIBA requesting payment. Each invoice will contain an itemized description of the Work and all applicable charges and taxes.

Contractor will submit invoices at least monthly for Work performed.  Grace will pay in U.S. dollars the amounts set forth in any undisputed invoice within Net sixty (60) days from confirmed submission of accurate invoice by Contractor through Grace's designated procure-to-pay-system.

Payment by Grace will not constitute acceptance of the applicable Work.  Grace will notify Contractor of any dispute with respect to an invoice in writing.  Each party will use its respective best efforts to resolve any dispute within sixty (60) days.  For the avoidance of doubt, all undisputed amounts of Contractor's invoices shall be timely paid by Grace with only the disputed amounts, if any, of each invoice being withheld pending resolution of disputed and then paid upon resolution of dispute.  Should Grace overpay an invoice, Contractor will return the overpayment to Grace within fifteen (15) days after receipt thereof.  Credits against future purchases not taken by Grace within ninety (90) days will be remitted by check or EFT to the remittance address on the applicable Order.

**Exhibit F**
**Orders**

Grace and Contractor will execute one or more Statement(s) of Work agreed to between the parties from time to time.

Environmental & Remediation Services Agreement

# CHANGE ORDER

| Project Name | FUSRAP - Building 23 – Utility & Pre-Demolition Work |
|---|---|
| Contractor | |
| Purchase Order # | |

| Change Order # | |
|---|---|
| Date | |

**Once signed, this document is a notice to proceed with the approved changes outlined below.**

| Description of Changes Proposed | |
|---|---|
| | |

| Item | Description | Amount ($) |
|---|---|---|
| | | |
| | | |
| | | |
| | *TOTAL* | |

| Contract Price Adjustment | Amount | Site Acceptance |
|---|---|---|
| Original Contract | | |
| Prior Adjustments | | |
| Contract Total Prior to this Change | | |
| Net Adjustments for this Change Order | | |
| Revised Contract | | |

Environmental & Remediation Services Agreement

| Contract Schedule Adjustment | Amount | Site Acceptance |
|---|---|---|
| Original Contract Completion Date | | |
| Prior Adjustments | | |
| Construction Completion Date Prior to this Change | | |
| Net Adjustments for this Change Order | | |
| Revised Construction Completion Date | | |

| Declined Changes: | |
|---|---|
| Client declines the following items proposed by Contractor at this time: | |
| Item | Description |
| 1 | |
| 2 | |
| 3 | |

<u>Approvals</u>                                   Signature                           Date


Grace Project Manager          _____        _____



Grace Supply Chain Rep         _____        _____



Authorized Contractor Rep      _____        _____

**Exhibit I**
**Contractor Safety Data Sheet**
[*complete if requested by Grace*]

NAME OF FIRM:_____     CONTACT PERSON:_____

ADDRESS:_____     TYPE OF WORK:_____

PHONE #:_____     SIC/NAICS CODE:_____

SUBMITTED BY:_____     TITLE:_____

DATE:_____

1.      List your firm's workers' compensation experience modification rates (EMR) for the last three years.

| | | COVERAGE TYPE | | | |
|---|---|---|---|---|---|
| YEAR | RATE | CLAIMS MADE | OCCURRENCE | POLICY NO. | CARRIER |
| | | | | | |
| | | | | | |
| | | | | | |

2.      List your firm's OSHA incidence rate for the last three years.  (Use your OSHA Form No. 300 and the formula:
$$\text{Numbers of incidents X 200,000 hrs} = \text{Incidence Rate}$$
$$\text{Number of hours worked}$$

Provide the incidence rates for the following categories:

| | INCIDENCE RATES BY YEAR | | |
|---|---|---|---|
| CATEGORIES | 20___ | 20___ | 20___ |
| Total Fatalities | | | |
| Total Lost Time Incidents | | | |
| Total Lost Workday Severity Rate | | | |
| Injuries/Illnesses with Restricted Workdays | | | |
| Total Recordables | | | |
| Medical Treatment Cases | | | |
| TOTAL WORKHOURS WORKED | | | |

Please provide copies of total Grace OSHA 300 logs and/or typical specific and similar site logs.
Note: Contractors whose three-year average incidence rates are above the most recently published BLS rates will be reviewed with purchasing and safety to determine if allowed to work on the Grace site.

3.      Do you have a written safety program?                    YES_____     NO_____
        If yes:
        Who is the responsible person for development and administration of your safety program?_____
        _____

4.      Do you have one or more full-time:
        a.      Physicians?                                  YES_____     NO_____
        b.      Safety Professionals?                        YES_____     NO_____

        c.      Industrial Hygienists?                       YES_____     NO_____
        d.      Other Care Providers? Specify:_____  YES_____     NO_____

5.      Do you have a new employee orientation program?         YES_____     NO_____

Environmental & Remediation Services Agreement

**Does it include instruction in the following?**

| | YES | NO |
|---|---|---|
| **Grace Environmental, Health, Safety and Security Policy** | | |
| **Grace Environmental, Health, Safety and Security Rules and Orientation** | | |
| **Grace Emergency Response Plan** | | |
| **Hazard Communication** | | |
| **Hazard Reporting** | | |
| **Injury Reporting** | | |
| **Non-Injury Reporting** | | |
| **Personal Protective Equipment** | | |
| **Fire Protection** | | |
| **Housekeeping** | | |
| **Material Safety Data Sheets** | | |
| **Electrical Safety** | | |
| **Safety Belts and Lifelines** | | |
| **Confined Space Entry** | | |
| **Lock and Tag/Control of Hazardous Energy** | | |
| **Abrasive Blasting and Hydroblasting** | | |
| **Ladder/Scaffold Safety** | | |
| **Driving Safety** | | |
| **Industrial Vehicles (Manlifts/JLGs/Forklifts/Cranes/etc.)** | | |
| **Hot Work** | | |
| **Line Breaking** | | |
| **Respiratory Protection (airline & SCBA)** | | |
| **Drug & Alcohol Policy** | | |
| **First Aid/CPR** | | |
| **Hearing Conservation** | | |

6.  Do you have a training program for newly hired or promoted first line supervisors?                    YES_____                    NO_____

Does it include instruction in the following?

| | YES | NO |
|---|---|---|
| **Hazard Recognition** | | |
| **Safe Work Practices** | | |
| **Safety Supervision** | | |
| **New Employee Orientation** | | |
| **Tailgate/Toolbox Safety Meetings** | | |
| **First Aid/CPR Procedures** | | |
| **Emergency Procedures** | | |
| **Incident Reporting** | | |
| **Accident Investigation** | | |
| **Other:** | | |

7.  Do you hold periodic safety meetings for the following and in what frequency are they held (weekly, bi-weekly, monthly, daily):

    a.    Field Supervisors        YES_____    NO_____ FREQUENCY_____
    b.    Employees        YES_____    NO_____ FREQUENCY_____
    c.    New Hires        YES_____    NO_____ FREQUENCY_____
    d.    Subcontractors        YES_____    NO_____ FREQUENCY_____

8.  Do you conduct field safety inspections of work in progress?      YES_____      NO_____

    a.    If yes, who conducts the inspection?_____
    b.    How often?_____

9.  Are all incidents investigated to determine their cause, and is corrective action taken?
                YES_____                    NO_____

10.
Do you notify all employees of accidents and corrective action related to accidents and near misses?
                 YES_____                    NO_____

If yes, how is this notification accomplished:

    a.    Safety meetings?           YES_____                    NO_____
        If yes, how soon after the event?_____

    b.    Written notification?           YES_____                    NO_____
        If yes, is this notification posted near the site where the incident occurred?

Environmental & Remediation Services Agreement

|  | YES_____ | NO_____ |
|---|---|---|
| c.   Other:_____ | | |

11.   **Is safety a criterion in evaluating the performance of:**

| a. | **Foreman** | YES_____ | NO_____ |
|---|---|---|---|
| b. | **Supervisors** | YES_____ | NO_____ |
| c. | **Management** | YES_____ | NO_____ |

12.   **Do you require medical certification and fit testing for respirator wearers?**

YES_____        NO_____

13.   **Do you provide medical evaluations for your employees?  (i.e., pulmonary function, kidney/liver function, etc.)**

YES_____        NO_____

List medical evaluation scope:_____

14.   **Who handles your field medical emergencies?**_____

15.   **Do you have substance abuse testing?**                           YES_____        NO_____

16.   **Do you have an employee assistance program?**              YES_____        NO_____

17.   **Do you participate in any industry-wide safety programs through contractor and/or labor associations?**
       YES_____        NO_____
       **If yes, give an example of your participation.**
       _____

18.   **Do you advise the client (owner) of any hazard(s) that have been brought about by manner of the work or discovered during the performance of work?**        YES_____        NO_____

19.   **If requested, you may be required to provide copies of the following along with items/programs specified previously:**

| a. | **Overview of in-house "safe work" practices.** |
|---|---|
| b. | **Overview of craft skill training programs.** |
| c. | **Documentation that all employees have been adequately trained in safety and environmental responsibility and have received OSHA required training relevant to their job.** |
| d. | **The extent, type and quality of safety and environmental training provided to employees.** |
| e. | **How do you document that your employees have received and understood safety training?** |
| f. | **How do you certify instructors?** |
| g. | **List of safety policies and training requirements.** |
| h. | **How does your site supervisor maintain MSDS and make them available to employees?** |
| i. | **Who maintains records (training, medical, respiratory fit, drug testing), and where are they kept?** |
| j. | **Confirmation that an employee can understand verbal and written instructions in English.** |
| k. | **Outline of employee benefits program, including employee absentees and turnaround rates for the previous three years.** |